THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ELECTRO PROCESS, INC., GEORGE H. SMITH and CORNELIUS F. DENEEN, Defendants.

Supreme Court, Erie County, February 18, 1953.

*Nathaniel L. Goldstein, Attorney-General (Matthew A. Tiffany* of counsel), for plaintiff.

*Ulysses S. Thomas* for Electro Process, Inc., and another, defendants.

*William E. Barrett* for Cornelius F. Deneen, defendant.

SAMUEL J. HARRIS, Official Referee. By means of this action plaintiff seeks judgment that the defendants have been engaged in fraudulent practices in the sale of securities within the meaning of section 352 of article 23-A of the General Business Law of the State of New York, a statute commonly known as the Martin Act.

Action was brought by the service of a summons and complaint in March, 1951. Issue was joined in May, 1951, by the service of the answers of the named defendants. By means of a show cause order dated March 20, 1951, the Attorney-General obtained from the Special Term an injunction *pendente lite.* Such injunction was addressed against all defendants and was most inclusive in its nature insofar as forbidding the defendants or any of them from engaging in any violations

of the Martin Act. This temporary injunction has ever since been in full force and effect and there has been no violation of the same to the present time by any of the defendants. With the consent of the parties and by order of the Special Term under date of June 8, 1951, the issues in this action have been referred to me as an Official Referee of the Supreme Court to hear and determine. The first proceedings of the trial were held before me on June 16, 1951, and the last hearing was on October 8, 1951. During the interim between these dates and including these dates I sat twenty-one days in court hearing testimony and receiving exhibits and listening to arguments. When the proof was closed on October 8, 1951, each of the counsel for the interested parties sought and received from the court a reasonable length of time in which to file briefs. The briefs were not received within the times designated. The Attorney-General was delayed several months in filing his brief because of what he termed more urgent business in his office; after service of the brief of the Attorney-General there was a further delay, part of it inexplainable but most explained by the illness of counsel for the corporate defendant and defendant Smith, which resulted in the death of that counsel. Mr. Thomas was a respected lawyer, long in the service of the courts of this State and his passing has been a matter of sorrow to the Bench and Bar.

The delay in the filing of the briefs of the defendants continued until the substitution of counsel in place of Mr. Thomas, and the later filing of briefs by all defendants on December 18, 1952, and the answering memorandum of the Attorney-General at the end of the month of December, 1952.

During the course of the trial there was presented before the court and to the court testimony that in transcription covered 2,165 pages and in addition to this testimony there were read to the court and placed in the record several hundred pages of the testimony taken on examination before trial. The number of exhibits before the court totaled about one-half hundred.

The time has now come to discuss the merits of this proceeding in order to write this decision. To be borne in mind in reaching such decision is the intent and purpose of the so-called " Martin Act ". That act is of the type of statute referred to in many judicial decisions as a " blue sky law." Its object is to prevent the swindling of persons through the sale of fictitious, valueless and over-valued securities and commodities. The test of whether the law has been violated is whether there have occurred in the sale of securities and commodities " deceit-

ful practices contrary to the plain rules of common honesty." (*People* v. *Federated Radio Corp.*, 244 N. Y. 33, 38.)

It is with this test in mind that I have examined the record and reached my decision as hereinafter set forth. The record to my mind proves the following:

The defendant corporation is of domestic origin and its business is that of polishing metals by use of electricity and chemicals. The defendant Smith is its principal officer; the corporation has other officers and stockholders and all have been active in its affairs but no other one of them except Mr. Smith has been made party defendant.

The defendant Deneen has been for many years licensed to practice law in the State of New York but for a number of years has devoted the larger part of his time to an occupation to which he has been licensed, to wit: the marketing of securities.

The proof concerning the corporate defendant and the individual defendant Smith and his associates in the corporation and its work and concerning the defendant Deneen may be summarized succinctly as follows:

All of these individuals to whom reference has been made are men of mature age, and except Deneen have been occupied in industry in the working with metals and have had considerable knowledge of chemistry. There is one exception to this and that is Mr. George Kennedy, who is a mortician by profession, who has had some experience with metals and with the study of chemistry.

In the year 1946, one Zena Cummings, who had previously worked in an industrial organization with the defendant Smith, had occasion to visit the city of Detroit and there became acquainted with the fact that there was current an occupation known as " metal polishing ". This study or occupation, in the measuring of time, can be said to be of recent knowledge even with scientists. The first published discussion occurred in 1910. The next printed reference to metal polishing was in 1930, then came some live discussion of the topic in Europe in 1937 and following this the subject was of interest to industrialists and chemists in this country. Patent applications in the field were made in this country, the first about 1938. The second World War delayed the use of the process and what has been called the " scramble to get the electro polishing jump " began in the early '40s of this century. Patents have been issued and the process of electropolishing has been in use in this country ever since but, admittedly, there are wide

spaces in the metal industry in which the process or patents have not produced the desired results.

On his visit to Detroit Mr. Cummings came across a shop conducted by a man named Hathaway doing this work as the owner of the shop. Under an agreement of compensation for the same, he gave to Mr. Cummings and Mr. Smith what was presumed to be a right to use the process that he was then using; in 1947 Mr. Cummings and the defendant Smith organized the defendant corporation and proceeded to use the process given to them by Mr. Hathaway, but after a short time they found, to their astonishment, that Mr. Hathaway had no right to grant them the use of the process because it did not belong to him. Cummings and Smith then turned to the use of another process given to them by Hathaway but a disastrous explosion in a shop using that process in California resulted in the prohibition throughout the country of the use of that process. Following this, Cummings and Smith went somewhat on their own and studied various processes in use throughout the country. Cummings finally left the organization and Smith continued in the venture and Mr. Kennedy became interested therein. The aid of trained chemists was sought and at all times since then, although not on the payroll for full time, a number of men who are trained chemists and metallurgists have worked in the interest of the corporate defendant. The possibility of the value to industry of a process that could be developed became well evident to Mr. Smith, Mr. Kennedy and their associates, and from time to time various additions and changes of chemicals have been used by those engaged in the work of the defendant corporation in endeavoring to perfect a process. Prior to the use of electropolishing what appeared to be the polishing of metals was gained by plating or buffing, but these methods did not produce the best of polishes on or remove the imperfections on the face of the metals and the perfect polishing in the place of plating and removing of imperfections has been the objective of those interested commercially and as chemists in electropolishing.

As time has gone on since the early '40s, like the defendant corporation, other studies have been made and a great part of them by the large chemical and industrial corporations of the country. The defendant corporation gained a clientele, largely in the vicinity of its locale and there is no doubt that up to the time of the trial of this action it had turned out work that was of an excellent result. Electropolishing includes, as has

been indicated, the use of electricity and chemicals and the bathing of the metal in the chemical solution. From time to time the defendant corporation has gained the confidence of worthwhile customers who have testified as to the outstanding merits of the process used by the defendants.

As time went on Mr. Kennedy, who became financial head of the corporation, decided that the capitalization should be enlarged from the original $50,000 to $600,000 stock. The thought then came to Mr. Kennedy and his associates of selling the process they were using, which they claimed to be secret, and/or to continue the polishing activities of the defendant corporation. A decision was made along two lines; one, to seek a patent and the application for a patent is still pending; the other, to sell stock for the purpose of straightening out the defendant corporation financially. Up to this time money had come into the corporation's coffers through its industrial income (which was not large) through small sales of stock to people who were engaged in the work with Mr. Smith and through the loans of money by Mr. Kennedy to the corporation. Through the introduction of Mr. Kennedy, the defendant Deneen was employed to handle the sale of stock and he continued in that employment from the middle of December, 1948, until January 13, 1950, when he was informed that the directors of the corporate defendant did not wish to sell any more stock because they had, at that late date, found other means of financing.

The sales of stock made by Mr. Deneen during his employment were meager in number and amount. Mr. Deneen had had experience in selling stock prior to his employment by the defendant corporation and so far as the record shows, there had never been any interference by the State authorities with his (Deneen's) sale of any stock although there were questions raised during the trial of this action as to his activities in the stock-selling field with other securities. At the beginning of his employment, Mr. Deneen visited the plant of the corporate defendant, which was a small concern, and never even up to the date of the trial set up to parallel a $600,000 corporation capitalization. He examined the process which was explained to him by Mr. Smith and with the aid of Mr. Smith prepared two pamphlets of information to be given or sent to prospective customers. These pamphlets are known as exhibits A and B attached to the complaint, and as exhibits 9 and 10 on the trial. They set forth, not with extreme modesty, the virtues of the corporation and its activities, listing a number of persons who.

it was claimed, had patronized the corporation, and spoke of one customer who had placed his own paraphernalia in the plant of the defendant and was to be regarded as a future $75,000-a-year patron and an establisher of branch plants of its own. In these exhibits it was said that there was a generous element of profit in the use of this process.

The proof, to my mind, establishes that there could be a generous element of profit provided there was a volume of business. The proof shows that this volume was not attained and that the corporation steadily was in the "red" so far as profits were concerned. It is fair to say, however, that being in the "red" is not indicative of the lack of merit of the process or the industrial activities of the corporate defendant and the results obtained by the corporate defendant for its customers. From the proof it can be further gathered, that the customer who placed its own paraphernalia in the plant of the defendant corporation did not progress in the manner which it planned because of the steel strike. The corporation continued doing business and there is no doubt that through its process it has satisfied its customers with work of desired quality.

Electropolishing, up to the time the corporate defendant came into the industry, had not progressed to the point where it was used as a process to polish and remove the imperfections from the surface of the lower or baser varieties of steel. Since the establishment of the business of the corporate defendant this result has been obtained by that corporation, as indicated by the testimony of its customers in regard to the electropolishing of such grades and the removal therefrom of such imperfections. This has brought high regard from these customers.

The complaint sets forth six causes of action briefly summarized as follows:

1. The use of the bulletin or information pamphlet, exhibits 9 and 10, which are claimed to contain gross misstatements and to be marked in the suppression and concealment of facts.

2. That defendant Smith, for the purposes of fraud, gave to two Buffalo newspapers and to a trade paper an article which stated that the corporation had been issued a patent for a new process by the United States Patent Office, when in fact no patent had been granted but only a patent application filed.

3. A charge that all of the defendants sold stock at a time when the corporation's liabilities exceeded its assets while reporting that the corporation was in good financial condition.

4. That the defendant corporation and defendant Smith made

false, misleading and untrue representations in regard to the affairs of the defendant corporation.

5. That defendant Smith sold his own stock and used the proceeds thereof for his own personal use at the time the corporation was offering for sale its capital stock.

6. That the defendant corporation offered for sale and sold its own capital stock without filing a dealer's statement with the Department of Law.

Plaintiff claims that all of the foregoing charges are fraudulent practices within the meaning of section 352 of the General Business Law of the State of New York.

As to the first cause of action, I necessarily reach the conclusion from the proof that there were certain misstatements in the exhibits 9 and 10 as to who were the customers of the corporation and as to the large customer who was planning a $75,000-a-year business and the establisher of branches. Such misstatements may have been due to hopefulness on the part of the defendant Smith or due to inadvertence on his part, but I do not believe that they were deliberate attempts to defraud, however, I must conclude that in common honesty they should not have been made. The defendant Deneen, as an experienced broker, should have been more careful in the information that he obtained and placed in exhibits 9 and 10. It is to be concluded on the proof, that the use of these circulars and pamphlets known as exhibits 9 and 10, could lead to misinformation given to prospective customers and that both defendants Smith and Deneen should not have prepared and put in circulation either of these exhibits because of liability to defraud possible customers.

As to cause of action No. 2, there is a dispute between the newspaper reporter and Mr. Smith as to what Mr. Smith did say as to a patent. My finding is that Mr. Smith was flushed with the thought that he had been successful in getting a patent when he received a copy of the application and thus probably lead the newspaper reporter to believe that he had obtained a patent and that he had a new process known to no one else. These newspaper articles and the trade magazine article could well lead to the damage of purchasing of stock on the strength of the articles.

As to the third cause of action, I see no fraud in the claim that defendants sold stock at a time when the corporation's liabilities exceeded its assets because I believe that at all times those who bought stock were informed as to the financial affairs

of the corporation and of the deficits that were being met by Mr. Kennedy.

As to the fourth cause of action and that the defendant Smith sold his own stock, I can see nothing violative of the law in such transaction, as set forth in the record.

As to the fifth cause of action, this is based on the claim that one Gladys Golem was defrauded by the corporation in the sale to Mrs. Golem of certain corporate stock, and the further claim that when the corporation made that sale it did not have a dealer's statement filed with the Department of Law. It was conceded on the trial by the defendant that it did not have a dealer's statement and the further proof that this deficiency had subsequently been remedied by the filing of such statement with the Department of Law. As to the actual transaction with Mrs. Golem, I find from the proof that the purchase of the stock by her and the sale to her was not made by any fraudulent practice or effort to cheat her. Mrs. Golem consulted with her own attorney and made her own investigation. She was a woman, apparently, of some business wisdom. She purchased the stock partly through her own investigation and partly through encouragement of a party named Jordain, who, at the time, was a social and business friend of hers and with his encouragement and her own free will she made the purchase. In these transactions with Mrs. Golem the corporate defendant and its representatives acted with all fairness to Mrs. Golem. When she became dissatisfied with her bargain, one of the chemists associated with defendant corporation secured in his own family a customer who bought from her the stock which she had purchased and paid to her the amount which she had paid for the same. Her complaint, apparently, was due to the fact that she, to recover her money and of her own desire, obtained an attorney and paid a fee and that after making the purchase she fell out, socially, with her friend Jordain, who had been her advisor.

Now, I come to my conclusions herein and the reasons therefor. Although the contents of the pamphlets of information, exhibits 9 and 10 on the trial, and the information given by the defendant Smith to the daily newspapers and trade paper are construed as susceptible of inducing purchases by fraud within the meaning of the statute herein discussed, there is no proof that any purchases were so induced. There is proof that clearly establishes that the connections between the defendant Deneen and the corporate defendant were severed an appreciable period

of time before the commencement of the action and that at no time has there been any complaint of fraud by any purchaser of stock secured through the efforts of the defendant Deneen. There also is no proof that the article in the daily papers and the trade paper has brought about any fraudulent sales. The preparation and use of the pamphlets, exhibits 9 and 10, and the giving of the information to the newspapers and to the trade journal were practices which come under the condemnation of the statute.

The temporary injunction granted prior to trial has been in force nearly two years and the record shows no violations by any of the parties hereto of the same.

During the period of time under discussion the business activities of the corporate defendant have continued and have not in any way brought complaints but rather have brought commendation from those who sought and received its service.

There is borne in mind by myself, the necessity of the Martin Act, the objective of which is remedial for the purpose of preventing and restraining fraud upon unsuspecting purchasers of securities. The Attorney-General, following his duty, has been most diligent in prosecuting this action on behalf of the People of the State of New York.

I can see no present reason to continue the temporary injunction or any portion thereof because at the time of the trial proof was made that satisfied me that although the possibility of fraud had existed, due to the cessation of the activities, by the defendants of using exhibits 9 and 10, and the services of the defendant Deneen the defendants were engaged in the sole pursuit of its industrial purposes. As has been said, there have been no violations of the injunction *pendente lite* to the time of its being granted.

In view of these conclusions on my part, I deem it best to dismiss the complaint herein and to dissolve the injunction *pendente lite*.

This may be regarded as my decision herein, and judgment may be entered thereon accordingly and without costs.